UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
THOMAS McCAFFREY

                                Plaintiff,          04-cv-5084
                                                    (SJF)(MLO)

                 -against-                        **OPINION & ORDER**

JO ANNE B. BARNHART,
Commissioner of Social Security,

                                Defendant.
------------------------------------------------------------X
FEUERSTEIN, J.

I.      Introduction

        Plaintiff Thomas McCaffrey ("McCaffrey" or "Plaintiff") commenced this action pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the final determination of the Commissioner of Social Security (the "Commissioner") denying disability insurance benefits to him. The Commissioner has moved for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff has crossed-moved for judgment on the pleadings, and seeks an order of remand for the computation of benefits only. For the reasons set forth below, the Commissioner's motion is denied and the Plaintiff's motion is granted in part.

II.     Background

        A.     Relevant Medical History

        Plaintiff filed an application for benefits with the Social Security Administration ("Administration" or "SSA") on February 28, 2002 alleging an inability to work due to "multiple

1

sclerosis, [and] lung disorder." (Tr. 46). Plaintiff, who was born on November 10, 1964, (Tr. 38), had worked as a Fire Fighter in the New York City Fire Department from 1990 until 2001, and a Police Officer in New York City Police Department from 1985 until 1990. (Tr. 47). Plaintiff was diagnosed with multiple sclerosis in August 1997. (Tr. 261). From the time of his diagnosis until October 2001, Plaintiff testified that he suffered from fatigue that necessitated "adjustments in personal and work," (Tr. 311), but did not preclude him from serving as a Fire Fighter. (Tr. 311). During this time period, Plaintiff also owned and operated a "power wash and painting business," which required him to do "the work himself." (Tr. 300). Plaintiff was, throughout this period, under the treatment of Dr. Karen Blitz.

After the terrorist attacks of September 11, 2001, Plaintiff worked for approximately three weeks at "Ground Zero." (Tr. 302). During this time, he generally worked for 24, and occasionally 48 straight hours. (Tr. 302). After three weeks of this work, Plaintiff claimed that he "took a nosedive," and began suffering from fatigue beyond that which he had previously experienced. (Tr. 303). As a result, he "went down to the medical office at which time I told them I had multiple sclerosis. They put me off the job." (Tr. 303). According to Plaintiff, "[a]t the end of the trade center, . . . I had a problem walking between my knees and my ankles and my joints. I physically at that point couldn't walk as far as – I just really couldn't do anything." (Tr. 303).

Shortly after reporting to the fire department medical office, Plaintiff visited Dr. Blitz. (Tr. 304). Dr. Blitz noted Plaintiff's deteriorating health, and prescribed intravenous steroids to "calm down the disease process" and Amantadine "to assist with his fatigue." (Tr. 248). Dr. Blitz also noted that Plaintiff's "present schedule, working for the Fire Department, is adversely

2

affecting his disease." (Tr. 248, 304). She did not change her diagnosis of multiple sclerosis. (Tr. 304). Over the next few months, Plaintiff testified that the steroid treatment "maintained me at some level . . . [but] as we rolled into December, I was at a point where . . . I ended up living on the first floor of my house . . . [because] I couldn't walk up the stairs." (Tr. 311). On December 28, 2001, Plaintiff was admitted to the Good Samaritan Hospital Medical Center, complaining of coughing and chest tightness. (Tr. 85). Plaintiff underwent a chest x-ray which "showed hilar lymphadenopathy suggestive of sarcoidosis." (Tr. 82). Plaintiff also underwent a transbroncial biopsy. (Tr. 82). Dr. Jerome Weiner noted the presence of mediastinal and hilar adenopathy, and suggested a possible diagnosis of sarcoidosis. (Tr. 90). Plaintiff was discharged on January 1, 2002, at which time he had "no complaints of shortness of breath or chest pain." (Tr. 82).

Plaintiff was readmitted to Good Samaritan on January 4, complaining of fever, pain in his arms and legs and coughing and wheezing. (Tr. 112). Plaintiff underwent numerous tests and was discharged on January 9, 2002. (Tr. 110). On January 10, 2002, Plaintiff was seen by Dr. Weiner, who obtained pulmonary functions and conducted a physical exam. (Tr. 164). According to Dr. Weiner, Plaintiff had "[m]ild restriction in view of the fact that his functional residual capacity was decreased . . . [and] has decreased mid-expiratory flow rates." (Tr. 164). Dr. Weiner further noted, however, that Plaintiff "had a normal total lung capacity . . . [and d]iffusion capacity is within normal limits." (Tr. 164). Dr. Weiner diagnosed Plaintiff with "likely sarcoidosis," but stated that he could not completely rule out infection. (Tr. 164). He prescribed Prednisone. (Tr. 164).

Plaintiff visited Dr. Arunabh on January 14, 2002 for a second opinion. (Tr. 184-185).

Dr. Arunabh, after reviewing Plaintiff's medical history, expressed concern that "even though this clinical picture can be seen in sarcoidosis, the possibility of other pathologies particularly lymphomas as well as other infective etiology (such as TB) cannot be ruled out." (Tr. 185). Dr. Arunabh also performed a spirometry,[1] which Dr. Arunabh characterized as "essentially a normal spirometry." (Tr. 185). Plaintiff had a follow-up visit with Dr. Aruhabh on January 22, 2002. Plaintiff stated that he felt better and that his cough had decreased and his exercise tolerance had improved. (Tr. 193). Dr. Arunabh continued to express concern that Plaintiff might have a "lymphomatous disorder," however, and recommended a bone marrow examination to rule out any "bone marrow involvement by any lymphomatous disorder." (Tr. 183).

Plaintiff visited Dr. Arunabh again on February 4, 2002. (Tr. 181). Although Plaintiff reported feeling better, he continued to feel "on exertion a bit winded . . . ." (Tr. 181). Dr. Arunabh again noted that "[t]he question remains whether we are dealing with sarcoidosis or is it in any other infiltrative phenomena presenting with bilateral hilar lymphadenopathy." (Tr. 181). Dr. Arunabh stated that he remained "concerned that this may represent a slowly progressive lymphoproliferative disorder rather than sarcoidosis," and recommended additional "investigations to rule out the diagnosis." (Tr. 181).

On February 5, 2002, Plaintiff visited Dr. John Loscalzo, an oncologist/hematologist. (Tr. 168). Dr. Loscalzo conducted a physical exam, describing Plaintiff as "a well appearing male in no acute distress . . . Lungs are clear to auscultation. Heart regular rate and rhythm." (Tr. 169). Dr. Loscalzo stated that the "diagnosis is still unclear," although he did note that "the

---

[1]Spirometry is a "[m]easurement of air flow and lung volumes." Tabers Cyclopedic Medical Dictionary, 2002.

symptoms before the initiation of steroids could be suggestive of a lymphoproliferative disorder." (Tr. 168-169). Dr. Loscalzo performed a bone marrow aspiration and biopsy. (Tr. 169A).

Plaintiff was examined again by Dr. Arunabh on February 19, 2002. (Tr. 179). According to Dr. Arunabh, Plaintiff reported feeling "much better," and "says his dyspnea on exertion has also improved." (Tr. 179).[2] Dr. Arunabh reviewed a previously-taken CAT scan, which "showed that there was slight regression of the lymphadenopathy in the mediastinum and the hilar region." (Tr. 179). Dr. Arunabh reiterated his concern that this "is very suggestive of sarcoidosis, but the increase [sic] spleen makes me wonder if there is any other associated disorder that may explain this extensive lymphadenopathy." (Tr. 179).

On February 25, 2002, Plaintiff visited Marijean Buhse, R.N., in Dr. Blitz's office. (Tr. 246). According to Ms. Buhse, Plaintiff advised that he had been suffering from shortness of breath since his last visit in October 2001, and had been seeing a pulmonologist and oncologist. Ms. Buhse stated that the pulmonologist "was concerned at one time that it was sarcoid, but he has ruled that out. They have not ruled out an oncological problem." (Tr. 246). Dr. Blitz and Ms. Buhse administered 1,000 mg of Solu-Medrol to stabilize Plaintiff's multiple sclerosis. (Tr. 246).

On March 14, 2002, Dr. Arunabh wrote a letter to Dr. Anthony Guida, relaying the results of the CAT scan and bone marrow aspiration performed on Plaintiff. According to Dr. Arunabh, "there was in addition to bilateral hilar adenopathy evidence of slight splenic enlargement . . . The results [of the bone marrow aspiration] were not diagnostic for any lymphomatous disorder.

---

[2]Dyspnea is "[a]ir hunger resulting in labored or difficult breathing, sometimes accompanied by pain." Tabers Cyclopedic Medical Dictionary, 2002.

5

I still believe that he has underlying sarcoidosis for which he is on Prednisone at this point . . . ." (Tr. 178). Dr. Arunabh explained that although Plaintiff "does not seem to have evidence of systemic sarcoidosis in [the] sense that he denies history of joint pain, skin disorder, cardiac disorders, eye involvement or any dermatopathy . . . I suggest that we should get an echocardiogram to evaluate his cardiac functions . . . ." (Tr. 178).

Plaintiff had a follow-up visit with Dr. Arunabh on March 25, 2002. (Tr. 176). Plaintiff reported to Dr. Arunabh that he was feeling better, and denied any history of fevers, chills, rigors, chest pain or hemoptysis. A physical examination revealed a room air saturation of 97%,[3] although a chest examination "reveal[ed] decreased air entry at the bases." (Tr. 176). Plaintiff advised Dr. Arunabh that his opthamologist, Dr. Schlesinger, told him "that he has no evidence of sarcoid eye involvement." (Tr. 176). Dr. Arunabh performed "a full set of spirometry," which he characterized as "essentially within normal limits." (Tr. 176). Dr. Arunabh explained to Plaintiff that "his mild dyspnea possibly is not on the basis of any lung dysfunction." (Tr. 176). Furthermore, Dr. Arunabh reviewed Plaintiff's echocardiogram, which "show[ed] normal left and right ventricle size and systolic function without any reason or variability." (Tr. 176). Dr. Arunabh believed Plaintiff's dyspnea to be only "slight," and suggested that Plaintiff "undergo a pulmonary exercise stress test . . . ." (Tr. 177).

Plaintiff visited Ms. Buhse again on April 9, 2002. (Tr. 245). According to Ms. Buhse, Plaintiff reported that "his pulmonologist is leaning toward sarcoidosis as a diagnosis." (Tr. 245). Plaintiff advised Ms. Buhse that he was "feeling okay, except that he has absolutely no

---

[3] Saturation is defined as "[t]he saturation of the arterial blood with oxygen, expressed as a percentage . . . . It is normally greater than 96%." Tabers Cyclopedic Medical Dictionary, 2002.

energy . . . and is unable to perform the regular tasks of the day that he normally would." (Tr. 245). Plaintiff was administered 1,000 mg of intravenous Solu-Medrol. (Tr. 245).

On April 15, 2002, Plaintiff returned to see Dr. Arunabh for a follow-up visit. (Tr. 270). Dr. Arunabh reviewed Plaintiff's exercise test, which was "consistent with slight deconditioning." (Tr. 270). Plaintiff's echocardiogram "did not reveal any significant left ventricular dysfunction." (Tr. 270).

During April 2002, both Drs. Arunabh and Blitz completed questionnaires for the New York State Office of Temporary and Disability Assistance regarding Plaintiff's condition. (Tr. 171-76, 239-244). Dr. Arunabh indicated that Plaintiff could engage in limited work-related physical activities for up to 1/3 of a day, including lifting up to 4-5 pounds, and that Plaintiff could stand and/or walk for "up to 2 hours per day." (Tr. 173). Dr. Blitz found that Plaintiff had a limited ability to lift and carry, push and/or pull and stand and/or walk as part of work-related physical activities, but was not limited in his ability to sit. (Tr. 243). She also found that Plaintiff had "unexplained dyspnea and adenopathy." (Tr. 244).

Plaintiff underwent a chest CT on May 17, 2002. (Tr. 274). According to Dr. Shah, the attending radiologist, the CT scan revealed "significant improvement in the mediastinal lymphadenopathy. There is [sic] now only a few subcentimeter lymph nodes in the pre-vascular and pretracheal space. No hilar lymphadenopathy is present. The heart size [is] normal, without pericardial effusion. Examination of the lungs reveal no endobronchial lesion. Previously noted nodules in both lower lobes have also significantly decreased in size . . . ." (Tr. 274).

On June 14, 2002, Plaintiff went to the Good Samaritan emergency room for "cramping in [his] midsection." (Tr. 215). A sonogram revealed that neither his liver nor spleen were

enlarged, but did show "mild fatty infiltrations of the liver . . . [and s]ludge [wa]s seen in the shadows seen from the gallbladder." (Tr. 219). A chest x-ray was performed, which showed "mild residual, but significant improvement in the previously-noted hilar adenopathy. There is also improvement in the mediastinal adenopathy . . . Lung fields show no infiltrates and no pneumothorax." (Tr. 220). Plaintiff's "lung fields [were] clear." (Tr. 220).

On June 21, 2002, Plaintiff visited Ms. Buhse, complaining of difficulty breathing as a result of "pain he is having in the right side of his abdomen." (Tr. 237). Dr. Blitz and Ms. Buhse decided to gradually increase Plaintiff's Neurontin, and recommended he return for intravenous Solu-Medrol in the near future. (Tr. 237).

Plaintiff visited Dr. Arunabh on September 16, 2002 for a follow-up visit. (Tr. 276). Plaintiff advised Dr. Arunabh that he had "tapered himself off the steroids completely for the last two weeks." (Tr. 276). Dr. Arunabh conducted a physical examination, which revealed that Plaintiff's room air saturation was 97%, although "[c]hest examination reveals decreased air entry at bases." (Tr. 276). In a September 20, 2002 letter to Dr. Guida describing this visit, Dr. Arunabh stated that "Mr. McCaffrey has sarcoidosis, possibly related to Avonex use." (Tr. 276). Dr. Arunabh recommended that Plaintiff have another CAT scan of his chest. (Tr. 276).

Plaintiff went to the emergency room at Southampton Hospital on September 27, 2002, complaining of chest pain and difficulty breathing. (Tr. 226). Plaintiff stated that it felt like he had "an elephant on [his] chest." (Tr. 224). Dr. Howard Sklarek conducted a physical examination, which revealed, <u>inter alia</u>, a room air saturation of 99% and "clear lung fields." (Tr. 226). After reviewing a chest x-ray, Dr. Sklarek stated that it was "clear and in fact did not appreciate any significant thoracic lymphadenopathy." (Tr. 227).

According to Dr. Blitz, on October 1, 2002, Plaintiff had "minimal pain," and was responding well to the Neurontin that had been prescribed at Southampton Hospital. (Tr. 236). Dr. Blitz stated that she "suspect[ed] that the sarcoid here is drug induced." (Tr. 236).

An MRI was performed on Plaintiff's brain on October 3, 2002. (Tr. 264). Dr. Rona Woldenberg, the attending radiologist, noted that there were "[n]o definite new foci of signal abnormality . . . [and n]o abnormal enhancement is seen." (Tr. 264). Dr. Woldenberg did note that, consistent with a previous MRI, Plaintiff had "several areas of signal hyperintensity on the FLAIR and T2-weighted sequences in the peri ventricular and subcortical white matter." (Tr. 264).

On October 15, 2002, Plaintiff again visited Dr. Arunabh. (Tr. 277). Dr. Arunabh noted that "[a]t this point, he is not that symptom-limited from a pulmonary point of view" and therefore recommended that "we should just follow him." (Tr. 277).

Dr. Blitz completed a Multiple Sclerosis Source Statement on October 31, 2002. (Tr. 233-34). She noted that Plaintiff suffered from, inter alia, fatigue, numbness, sensory disturbance, depression and double or blurred vision. (Tr. 233). She further opined that Plaintiff suffered from fatigue typical of multiple sclerosis patients and had impairments that were "reasonably consistent with the symptoms and functional limitations described in [the] evaluation." (Tr. 234). She stated that Plaintiff's pain, fatigue or other symptoms were "seldom" severe enough to interfere with attention and concentration, but that Plaintiff was "[i]ncapable of even 'low stress' jobs." (Tr. 234). Dr. Blitz also stated that Plaintiff would not be capable of "working 5 days a week, full time, on a sustained basis at a 'light' job" nor would he be able to work "5 days a week, full time, on a sustained basis at a 'sedentary' job." (Tr. 234). Finally, she

9

stated that Plaintiff's condition was likely to produce 'good days' and 'bad days,' and opined that he was likely to be absent from work more than four times per month." (Tr. 235).

Plaintiff visited Dr. Blitz again on November 13, 2002, complaining of "increased, almost charleyhorse-like feeling in his legs, from the knee down." (Tr. 265). Still believing that Plaintiff had multiple sclerosis, she referred Plaintiff to a facility at Mount Sinai to rule out sarcoidosis. (Tr. 265).

Plaintiff was seen by Dr. Alvin Teirstein of Mount Sinai on November 25, 2002. (Tr. 268). Dr. Teirstein, a pulmonologist, noted that Plaintiff continued to suffer from dyspnea and coughing. (Tr. 268). A physical examination revealed, inter alia, a regular respiratory rate of "16/min" and lungs that were "clear to percussion and auscultation." (Tr. 269). Plaintiff's spirometry and diffusing capacity were both normal. (Tr. 269). Dr. Teirstein concluded that Plaintiff's most recent chest x-rays, from June and November 2002, were normal, and stated his belief that Plaintiff "undoubtedly has sarcoidosis." (Tr. 269). Dr. Teirstein prescribed Plaquenil, which he believed to "be ample medication to control his sarcoidosis." (Tr. 269).

Dr. Blitz issued a report on December 3, 2002, concurring with Dr. Teirstein's diagnosis of sarcoidosis and indicating that she suspected "this was a drug induced sarcoidosis." (Tr. 266). Regardless of the cause, she believed Plaintiff suffered from "sarcoidosis, solely" and not multiple sclerosis. (Tr. 266). She prescribed Plaquenil and Neurontin, and recommended that Plaintiff "be followed closely by a pulmonologist, . . . [and] follow with [her] only as needed, for pain." (Tr. 266).

Plaintiff visited Dr. Arunabh on February 11, 2003. (Tr. 278). Plaintiff advised Dr. Arunabh that he was feeling "much better." (Tr. 278). A physical examination revealed, inter

10

alia, that Plaintiff's room air saturation was 98%, with decreased air entry at bases. (Tr. 278). Dr. Arunabh stated that Plaintiff "has evidence of sarcoidosis," and recommended that Plaintiff undergo, inter alia, another CAT scan of his chest. (Tr. 278). Dr. Arunabh opined that Plaintiff's "lung condition seems stable," (Tr. 278), and, subject to additional testing, "we can consider treating him with Plaquenil." (Tr. 278).

Dr. Arunabh completed a Medical Source Statement for Plaintiff's sarcoidosis on April 1, 2003. (Tr. 279-80). Dr. Arunabh opined that Plaintiff suffered from shortness of breath, fatigue and cough. (Tr. 279-80). He stated that he was "not sure" whether Plaintiff's symptoms were severe enough to interfere with attention and concentration, but believed Plaintiff would be incapable of working 5 days a week, full time at either a 'light' or 'sedentary' job.' (Tr. 280). He further stated that Plaintiff was likely to have 'good days' and 'bad days.' (Tr. 280). Dr. Arunabh deferred to Dr. Blitz regarding additional limitations from which Plaintiff might suffer. (Tr. 280).

Plaintiff visited Dr. Blitz on March 28, 2003. (Tr. 267). Although his breathing was improved, he reported fatigue and dysesthesias in his feet.[4] (Tr. 267). Dr. Blitz reported that Plaintiff had not begun taking Plaquenil, and had stopped taking Neurontin, Zanaflex and Provigil. Dr. Blitz suspected that "his recurrent symptoms [we]re related to discontinuation of the medication." (Tr. 267).

B.     Testimony of the Medical Expert

Dr. Gerald Greenberg, a board-certified internist and authorized medical expert, testified

---

[4]Dysesthesias is defined as "[a]bnormal sensations on the skin, such as a feeling of numbness, tingling, prickling, or a burning or cutting pain." Tabers Cyclopedic Medical Dictionary, 2002.

11

at Plaintiff's hearing that he believed Plaintiff suffered from multiple sclerosis. As he explained, "[t]he MRI originally apparently, according to the report in the exhibit file, was compatible with multiple sclerosis. That was many years ago. On review, the follow-up MRI seems to be normal, which would not exclude multiple sclerosis four or five years earlier. It does heal." (Tr. 318). Furthermore, Dr. Greenberg opined that he felt that Plaintiff's symptoms were incompatible with sarcoidosis. (Tr. 317). However, Dr. Greenberg testified that the specific diagnosis was "irrelevant in terms of the effect on [Plaintiff]." (Tr. 317).

According to Dr. Greenberg, Plaintiff was capable of "stand[ing] and walk[ing] for two hours . . . [s]it[ting] for six hours in an eight-hour work day [and] carry[ing] 10 pounds." (Tr. 321). Dr. Greenberg testified that, although Plaintiff complained of subjective fatigue and difficulty breathing, the "objective studies in the exhibit file which include pulmonary function studies, cardiac echo, [and] exercise tolerance are all basically within normal limits." (Tr. 317). Furthermore, Dr. Greenberg opined that, although Dr. Blitz believed Plaintiff was "'incapable of low stress due to overwhelming fatigue' . . . the objective evidence in the exhibit file which has to do with the physical limitations and the physical examinations would not preclude sedentary level of activity." (Tr. 321). Dr. Greenberg also stated that "what he's describing, to me, I would not make the presumption that this was overwhelming fatigue . . . . [T]hat would not preclude a sedentary level of activity. It certainly would preclude his previous employment in the fire department or in the police department prior to that." (Tr. 322).

Finally, Dr. Greenberg testified that fatigue is "not particularly associated with sarcoidosis except in extensive sarcoidosis involving the lung which is not involved here . . . . [I]t could be part of an acute episode [of multiple sclerosis] which presumably he had in the past . . . .

12

It's not a particular[ly] common finding. It does occur in episodes. Multiple sclerosis is an episodic disease . . . ." (Tr. 322). Dr. Greenberg also noted that fatigue can be a side effect of Avonex, a drug which Plaintiff had taken. (Tr. 323). However, Plaintiff testified that he had "stopped that right when I found out I was sick, so a year and half ago." (Tr. 324).

C.   The Commissioner's Findings

Administrative Law Judge Joseph Halpern (the "ALJ") issued a decision on September 17, 2003. (Tr. 13-18). The ALJ applied the five-step evaluation process established at 20 C.F.R. 404.1520, (Tr. 13), and found that: (1) Plaintiff had not engaged in substantial gainful activity since October 1, 2001, (Tr. 14); (2) the medical evidence establishes "that the claimant has severe sarcoidosis and possible multiple sclerosis, but that he does not have an impairment or combination of impairments listed in or medically equal to one listed in Appendix 1, Subpart P, Part 404 of the Regulations," (Tr. 17); and (3) Plaintiff was unable to perform his past work as a firefighter because of his impairment. (Tr. 16-17). The ALJ then shifted the burden "to the Commissioner to show that the claimant has residual functional capacity to perform other jobs existing in significant numbers in the national economy." (Tr. 16) (citing Acquiescence Ruling 00-4(2)). The ALJ found, citing primarily to Dr. Greenberg's testimony, that Plaintiff "has the residual functional capacity to perform sedentary work the range of which is not reduced by any nonexertional limitations." (Tr. 16). The ALJ therefore ruled that Plaintiff did not have a disability, as defined in the Social Security Act, and was therefore not entitled to disability benefits.

Plaintiff appealed the ALJ's decision to the Social Security Appeals Council (the "Appeals Council") on November 17, 2003. (Tr. 9). On September 24, 2004, the Appeals

Council denied Plaintiff's request for review of the ALJ's decision on the grounds that (1) the ALJ did not abuse his discretion, (2) there was no error of law, (3) the decision was supported by substantial evidence, (4) there was no broad policy or procedural issue that might affect the public interest, and (5) there was no new and material evidence, nor was the decision contrary to the weight of all the evidence then in the record. (Tr. 3).

III.  Legal Standard

   A.  Standard of Review

A District Court's review of the denial of social security benefits is confined to whether there is "substantial evidence" to support the Commissioner's decision. 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); see also Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) ("[W]e conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied."). Therefore, the Court must affirm the Commissioner's decision if it is supported by substantial evidence even if the district court might have ruled differently were it to have made the initial determination. Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). "The Social Security Act is a remedial statute which must be liberally applied; its intent is inclusion rather than exclusion." Marcus v. Califano, 615 F.2d 23, 29 (2d Cir. 1979)); see also Vargas v. Sullivan, 898 F.2d 293, 296 (2d Cir. 1990); Williams v. Bowen, 859 F.2d 255, 260 (2d Cir. 1988).

In this context, substantial evidence has been defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a

14

conclusion.'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such finding, including, any contradictory evidence and evidence from which conflicting inferences may be drawn." Rivera v. Sullivan, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).

B.   Determining Disability

Title II of the Social Security Act ("the Act") defines disability as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). An individual may be determined to be under a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A).

The implementing regulations establish a five-step sequential analysis by which the Commissioner is required to evaluate a claim for disability benefits. Draegert v. Barnhart, 311 F.3d 468, 472 (2d Cir. 2002); 20 C.F.R. § 404.1520. First, the Commissioner must determine whether the claimant is doing substantial gainful work. 20 C.F.R. § 404.1520(b). Second, if the claimant is not doing substantial gainful work, the Commissioner must then determine whether he or she has a "severe impairment." § 404.1520(c). Third, if a severe impairment exists, the

Commissioner must next consider medical evidence to determine if the claimant has an impairment listed in Appendix 1 of the regulations. § 404.1520(d). Fourth, if the claimant does not have a listed impairment, the Commissioner must analyze whether the impairment prevents the claimant from doing his or her past work. § 404.1520(e). Finally, if the claimant cannot perform past work, the Commissioner must determine whether the impairment prevents him or her from doing any other work. § 404.1520(f). If so, the Commissioner must find the claimant disabled. Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999). The claimant bears the burden of proof on the first four steps of this analysis. However, once the claimant has met his or her burden, the Commissioner then has the burden of proving that the claimant still retains "a residual functional capacity to perform alternative substantial gainful work which exists in the national economy. Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). The Commissioner's burden at the fifth step is usually determined "by resorting to the applicable medical vocational guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)." Id. Taking into account the claimant's residual functional capacity, age, education, and work experience, the grids indicate whether the claimant is able to engage in any substantial gainful work existing in the national economy. Rosa v. Callahan, 168 F.3d 72, 78 (2d Cir. 1999).

IV.     Analysis

    A.     The Treating Physician Rule

In determining whether a claimant is disabled, the treating physician rule, contained at 20 C.F.R. § 404.1527(d)(2), "requires a measure of deference to the medical opinion of a claimant's treating physician." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). However, "the

opinion of the treating physician is not afforded controlling weight where, as here, the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Id. at 32. In the event of such an inconsistency, the regulations establish a number of factors to be considered in determining the relative weight of the treating physician's opinion. "Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Id. at 32 (citing 20 C.F.R. § 404.1527(d)(2)). Furthermore, consistent with the ALJ's "affirmative obligation to develop the administrative record," Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996), the regulations require the ALJ to give "good reasons" for the weight, or lack thereof, given to a treating physician's opinion. Halloran, 362 F.3d at 32.

In the instant case, the ALJ failed to properly develop the administrative record and apply the necessary factors when deciding to afford greater weight to Dr. Greenberg's testimony. Specifically, although the ALJ generally described the relevant factors in the "Issue" section of his decision, (Tr. 14), his "Evaluation" section fails to consider all of these factors and give "good reasons" for his decision to assign the treating physicians' opinions "less weight than that of the medical expert . . . ." (Tr. 16). Thus, while the ALJ did find that Dr. Greenberg's testimony was "based on the objective evidence and supported by the clinical evidence," (Tr. 16), he failed to consider the other factors, including (1) the frequency, length and extent of the treating physicians' relationship with Plaintiff, (2) any evidence in support of the treating

17

physicians' opinions, (3) whether the treating physicians were specialists and (4) whether any other factors exist that tend to support or contradict the treating physicians' opinions. 20 C.F.R. § 404.1527(d)(2). The ALJ's brief analysis examined only one of the relevant factors, and therefore did not fulfill the obligation to affirmatively develop the administrative record, and provide 'good reasons' for his decision to favor Dr. Greenberg's testimony. Halloran, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Heath v. Barnhart, 04-cv-2926, 2005 U.S. Dist. LEXIS 14405, at *17 (E.D.N.Y., Jul. 20, 2005) ("On this record . . . the Court cannot say with certainty what weight should be assigned to the opinion of [plaintiff's] treating physician.")

V.  Conclusion

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is DENIED, the Plaintiff's motion for judgment on the pleadings is GRANTED IN PART, and the case is hereby remanded for further proceedings in accordance with this Order. The Clerk of the Court is directed to close this case.

IT IS SO ORDERED.

_____

Sandra J. Feuerstein
United States District Judge

Dated: March 27, 2006
Central Islip, New York

To:

Jeffrey L. Goldberg
Eric Sanders
Jeffrey L. Goldberg, P.C.
2001 Marcus Avenue
Lake Success, NY 11042

Timothy D. Lynch
United States Attorneys Office
Eastern District of New York
One Pierrepont Plaza
Brooklyn, NY 11201